Kim D. Stephens, P.S., OSB #030635
Kaleigh N. Boyd (admitted *pro hac vice*)
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Telephone: (206) 682-5600
Email: kstephens@tousley.com
Email: kboyd@tousley.com

John J. Nelson (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

[*Additional counsel listed on signature page*]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| In re: Pacific Residential Mortgage, LLC Data Security Incident | Lead Case No. 3:25-cv-00549-SI **CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |

Plaintiffs Stephanie Tabibian, Tihomil Kraker, Alexander Cnossen, and Jerri Hopewell ("Plaintiffs") bring this Consolidated Class Action Complaint ("Complaint") against Pacific Residential Mortgage, LLC ("Defendant"), individually and on behalf of all others similarly situated. Plaintiffs allege, upon personal knowledge as to their own actions and their counsels' investigation, and on information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.       Plaintiffs bring this class action against Defendant for its failure to properly secure

and safeguard the sensitive information of its customers.

2.     Defendant is a mortgage financing company based in Beaverton, Oregon.

3.     Defendant collected and maintained certain personally identifiable information ("PII") of Plaintiffs and the putative Class Members (defined below), who are current or previous customers of Defendant.[1]

4.     Plaintiffs' and Class Members' sensitive personal information—entrusted to Defendant with the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised, and stolen by the notorious cybercriminal organization known as 'Lynx' in a February 2025 data breach of Defendant's network systems, which Defendant failed to prevent (the "Data Breach" or "Breach").

5.     On information and belief, the PII compromised in the Data Breach included Plaintiffs' and Class Members' names, dates of birth, addresses, driver's license numbers, credit reports, financial account information, Social Security numbers and other "similar information".

6.     Plaintiffs' and Class Members' PII compromised in the Data Breach was exfiltrated by Lynx cyber-criminals, who target PII for its value in committing fraud and identity theft.

7.     The sensitive and confidential PII taken in the Data Breach was published to the Lynx dark web leak site, whereas of March 29, 2025, it had already been viewed 2,981 times by unknown and nefarious actors' intent on further misusing Plaintiffs' and Class Members' data.

8.     As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to (a) invasion of privacy; (b) theft and misuse of their PII; (c) lost or diminished value of their PII; (d) lost time and opportunity costs associated with

---

[1] *PacRes Mortgage Discloses Data Breach Following Ransomware Attack,* CLAIMDEPO, (Mar. 27, 2025), https://www.claimdepot.com/data-breach/pacific-residential-mortgage

attempting to mitigate the actual consequences of the data breach; (e) loss of benefit of the bargain; (f) increased spam calls, texts, and/or emails; and (g) the continued and certainly increased risk to their PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

9.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyberattack.

10.     Moreover, on information and belief, Defendant was targeted for a cyberattack due to its status as a financial institution that collects and maintains highly valuable PII on its systems.

11.     Defendant maintained, used, and lost Plaintiffs' PII in a reckless manner. In particular, the PII was stored, used, and transmitted by Defendant in a condition vulnerable to cyberattacks. On information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

12.     Defendant disregarded the rights of Plaintiffs and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and accurate notice of the Data Breach.

13.     Plaintiffs' and Class Members' identities are now at risk due to Defendant's

negligent conduct because the PII that Defendant collected and maintained has been accessed and acquired by data thieves and published on the dark web.

14.     Armed with the PII accessed in the Data Breach, data thieves can engage in identity theft and fraud including, for example, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16.     Plaintiffs and Class Members will also incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     Plaintiffs bring this class action lawsuit on behalf of themselves and all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII, which it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to unauthorized access by an the notorious Lynx cybergang.

18.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach.

19.     Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class—including multiple Plaintiffs—are citizens of states different from Defendant.

21.     This Court has jurisdiction over Defendant through its business operations in this District. Defendant's principal place of business is in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

23.     Plaintiff Stephanie Tabibian is a resident and citizen of Springfield, Oregon, where she intends to remain.

24.     Plaintiff Timohil Kraker is a resident and citizen of Ocala, Florida, where he intends to remain.

25.     Plaintiff Alexander Cnossen is a resident and citizen of Camas, Washington, where he intends to remain.

26.     Plaintiff Jerri Hopewell is a resident and citizen of Lane County, Oregon where she intends to remain.

27.     Defendant Pacific Residential Mortgage, LLC is a company with its principal place of business located in Beaverton, Oregon.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

28.     Defendant is a mortgage financing company based in Beaverton, Oregon.

29.     Plaintiffs and Class Members are current and former customers of Defendant.

30.     In the course of their relationship, Defendant's customers, including Plaintiffs and Class Members, provided Defendant with their sensitive PII, including names, dates of birth, financial account information, addresses, and Social Security numbers.

31.     On information and belief, in the course of collecting PII from customers, Defendant promised to keep that information confidential, and to secure the data it collected from customers, through its applicable privacy policy and other disclosures, in compliance with statutory privacy requirements.

32.     Indeed, Defendant provides on its website, "To safeguard your personal information from unauthorized access and use, we implement security measures that comply with applicable federal laws and regulations. These measures include advanced computer safeguards, secure filing systems, and restricted access to physical locations to ensure the protection of your information."[2]

33.     Plaintiffs and the Class Members, as customers of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers in general demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

---

[2] https://pacresmortgage.com/privacy-policy

*The Data Breach*

34.    On or about March 25, 2025, Defendant began sending Plaintiffs and Class Members a Notice of Data Incident letter (the "Notice Letter"), informing them as follows:

## What Happened

On February 10, 2025, Pac Res detected that a ransomware lockdown of some of our systems was carried out by cybercriminals. We promptly hired a cybersecurity firm to secure our environment and conduct an investigation to determine the nature and scope of the incident. We quickly recovered the affected systems from backups and started our investigation of the incident. We also promptly informed law enforcement of the incident. Based on the results of the forensic investigation, Pac Res conducted a review of the information that was accessed by the cybercriminals to determine what information was maintained within the compromised systems for purposes of providing this notice to the potentially affected individuals.

## What Information Was Involved

We determined that your name, address, date of birth, Social Security number, driver's license number, financial account information, and similar information may have been impacted or accessible.[3]

35.    In short, Defendant had experienced a Data Breach in or about February 2025 in which it lost some of the most sensitive PII of Plaintiffs and the putative Class.[4]

36.    Omitted from the Notice Letter were the details of the root cause of the Data Breach the vulnerabilities exploited, and the remedial measures undertaken to prevent such a breach from occurring. To date, Defendant has yet to explain or clarify these omitted details to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

37.    This "disclosure" amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members with any degree of specificity of the Data Breach's critical facts. Without these

---

[3] A sample copy is available at https://oag.ca.gov/ecrime/databreach/reports/sb24-600398

[4] *Id.*

details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

38.     Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including (a) the Data Breach was the work of cybercriminals; (b) the cybercriminals infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated or "stole" data); and (c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' Social Security numbers for theft.

39.     In the context of notice of data breach letters of this type, Defendant's use of the phrase "may have been impacted or accessible" is misleading lawyer language. Companies only send such letters because data breach notification laws require them to do so—and those are sent only to those persons for whom Defendant has a reasonable belief that personal information was accessed or acquired by an unauthorized individual or entity. Defendant cannot hide behind legalese; by sending a notice of Data Breach letter to Plaintiffs and Class Members, Defendant effectively admits that it has a reasonable belief that Plaintiffs' and Class Members' names, Social Security numbers, and other sensitive information were accessed or acquired by an "unknown actor"—i.e., cybercriminals.

40.     Plaintiffs' investigation has since revealed the Lynx hacker group targeted and stole their and Class Members' PII from Defendant's systems in the Data Breach, and has since published it on the Lynx dark web leak site, for any nefarious actor to view and use to commit further crimes against Plaintiffs and Class Members.

41.     As of March 29, 2025, the PII Lynx obtained in the Data Breach and then published had already been viewed 2,981 times on the Lynx dark web leak site, shown in the following

screenshot (proof images blurred):



42.     Plaintiff's PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted her data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, for any nefarious actor to view and use to commit further crimes against Plaintiff. As of March 29, 2025, the PII Lynx obtained in the Data Breach and then published had already been viewed 2,981 times on the Lynx dark web leak site.

43.     Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members

should report their misuse to Defendant, or whether Defendant had set up a mechanism for reporting misuse.

44. Defendant had obligations under the FTC Act, the Gramm-Leach-Bliley Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

45. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, thereby causing the exposure of their PII.

46. Lynx hackers accessed and acquired files containing unencrypted PII of Plaintiffs and Class Members. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

### Data Breaches Are Preventable

47. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

48. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

49. In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network. [5]

---

[6] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

50. Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[6] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence . . . the initial assumption should be that data may have been exfiltrated."

51. An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[7] In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[8] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[9] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify that copies of the data are destroyed.[10]

52. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[11]

53. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could

---

[6] *Ransomware: The Data Exfiltration and Double Extortion Trends*, *available at* https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

[7] *The chance of data being stolen in a ransomware attack is greater than one in ten*, *available at* https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[8] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

[9] *Id.*

[10] *Id.*

[11] How to Protect Your Networks from RANSOMWARE at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[12]

54. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audits; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface]

---

[12] *Id.* at 3–4.

for Office [Visual Basic for Applications].[13]

55.     Given that Defendant was storing the PII of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

56.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in data thieves acquiring and accessing the PII of, on information and belief, tens of thousands of individuals, including Plaintiffs and Class Members.

***Defendant Acquires, Collects, and Stores Its Customers' PII***

57.     Defendant acquires, collects, and stores a massive amount of PII on its current and former customers.

58.     As a condition of obtaining financial services from Defendant, Defendant requires that customers and other personnel entrust it with highly sensitive personal information.

59.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

60.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

61.     On information and belief, in the course of collecting PII from customers, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data

---

[13] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

62.     Plaintiffs and Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information solely for business purposes, and to make only authorized disclosures.

### *Defendant Knew, or Should Have Known, of the Risk Because Financial Institutions in Possession of PII Are Particularly Susceptible to Cyber Attacks*

63.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting financial institutions that collect and store PII, like Defendant, preceding the date of the Breach.

64.     Data breaches, including those perpetrated against financial institutions that store PII in their systems, have become widespread.

65.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.  Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.  The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.  The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

66.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

67. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

68. Additionally, as companies became more dependent on computer systems to run their business,[15] *e.g.*, working remotely as a result of the Covid-19 pandemic and the rise of the Internet of Things ("IoT"), the danger posed by cybercriminals was magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[16]

69. Defendant knew and understood that unprotected or exposed PII in the custody of financial institutions like itself is valuable and highly sought after by nefarious third parties seeking to illegally monetize such information through unauthorized access.

70. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result.

---

[14] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Nov. 18, 2019 https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited May 22, 2025).

[15] Brando, Danny, Antonis Kotidis, Anna Kovner, Michael Lee, and Stacey L. Schreft (2022). *Implications of Cyber Risk for Financial Stability*, FEDS Notes. Washington: Board of Governors of the Federal Reserve System, May 12, 2022, https://doi.org/10.17016/2380-7172.3077 (last accessed May 22, 2025).

[16] Suleyman Ozarsaln, *Key Threats and Cyber Risks Facing Financial Services and Baking Firms in 2022*, Pycus Labs, *available at* https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

71.     Plaintiffs and Class Members now face years of ongoing monitoring of their financial and personal records, loss of rights, and the burden of heightened vigilance. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

72.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures to protect their PII.

73.     The ramifications of Defendant's failure to secure the PII of Plaintiffs and Class Members are long-lasting and severe. Once PII is stolen, fraudulent use of that information—and the resulting damage— may continue for years.

74.     As a financial institution in custody of the PII of its customers, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value Of Personally Identifying Information*

75.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number,

---

[17] 17 C.F.R. § 248.201 (2013).

employer or taxpayer identification number."[18]

76.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.[19]

77.     For example, personal information can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

78.     Of course, a stolen Social Security number can be used to wreak untold havoc upon a victim's personal and financial life.  The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

79.     It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[18] *Id.*
[19] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[21] *In the Dark*, VPNOverview, 2019, *available at* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

80. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[22] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[23]

81. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

82. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[25] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[26]

---

[22] *See* Social Security Administration, *Avoid Identity Theft*: *Protect Social Security Numbers*, *available at* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[23] *Id.*

[24] Social Security Administration, *Identity Theft and Your Social Security Number*, Equifax, *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf

[25] *See How to Protect Yourself from Social Security Number Identity Theft, available at* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[26] *See* Julia Kagan, *What is an SSN? What to Know About Social Security Numbers,* Investopedia (Sept. 2, 2024), *available at* https://www.investopedia.com/terms/s/ssn.asp

83. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

84. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

85. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number

---

[27] Stephanie Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

86. Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[28]

87. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[29]

88. A driver's license can be a critical part of a fraudulent, synthetic identity – which goes for about $1200 on the dark web. On its own, a forged license can sell for around $200."[30]

89. According to national credit bureau Experian,

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

---

[28] *See Your Social Security Number: Controlling the Key to Identity Theft,* State of California Department of Justice, *available at* https://oag.ca.gov/idtheft/facts/your-ssn

[29] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited May 22, 2025).

[30] Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long Breach*, Forbes, Apr. 20, 2021, *available at* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on May 25, 2025).

90.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[31] However, this is not the case.  As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[32]

91.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[33]

92.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, in such cases, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

93.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[34]

---

[31] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/
[32] *Id.*
[33] *How Identity Thieves Took My Wife for a Ride*, NY Times (Apr. 27, 2021) *available at* https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html

[34] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), *available at*

94.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

95.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[35]

96.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### Defendant Failed To Comply With FTC Guidelines

97.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

98.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer

---

https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html
[35] *Report to Congressional Requesters*, GAO at 29 (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf

networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[36]

99.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[37]

100.    The FTC further recommends that companies not maintain PII longer than is needed to authorize a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

101.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

102.    These FTC enforcement actions have included actions against financial institutions, like Defendant.

103.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or

---

[36] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf
[37] *Id.*

affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

104. Defendant failed to properly implement basic data security practices.

105. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

106. On information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its customers; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### Defendant Failed to Comply With The Gramm-Leach-Bliley Act

107. Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

108. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

109. Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant

time period Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1 *et seq*., and is subject to numerous rules and regulations promulgated under the GLBA statutes.

110. The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB has been responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

111. Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

112. Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant

violated the Privacy Rule and Regulation P.

113.    On information and belief, Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on Defendant's network systems.

114.    Defendant failed to adequately inform its customers that they were storing and/or sharing, or would store and/or share, customers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the customer relationship ended.

115.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

116.    As alleged herein, Defendant violated the Safeguards Rule.

117.    Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its IT

partners or verify the integrity of those systems.

118. Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### Defendant Failed To Comply With Industry Standards

119. As noted above, experts studying cyber security routinely identify financial institutions in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

120. Several best practices have been identified that, at a minimum, should be implemented by financial institutions in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backing data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

121. Other best cybersecurity practices that are standard for financial institutions include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

122. Defendant failed to meet the minimum standards of any of the following

frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), all of which are recognized standards in reasonable cybersecurity readiness..

123. These foregoing frameworks are existing and applicable industry standards for financial institutions, and on information and belief, Defendant failed to comply with at least one––or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Common Injuries & Damages*

124. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

***Data Breaches Increase Victims' Risk of Identity Theft***

125.     Plaintiffs' and Class Members' PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted the data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, for any nefarious actor to view and use to commit further crimes against Plaintiffs and Class Members.

126.     The unencrypted PII of Class Members will end up for further sale on the dark web because that is the *modus operandi* of hackers and those who visit dark web pages like the Lynx leak site.

127.     Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

128.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

129.     Plaintiffs' and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

130.     Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the

federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes . . . ."[38]

131. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[39]

132. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[40] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[41]

133. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[42]

---

[38] *See* N.C. Gen. Stat. § 132-1.10(1).

[39] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers

[40] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/

[41] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/

[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Stephanie Krebs, *Medical Records for Sale in*

134.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII linking unregulated data with stolen data to assemble complete dossiers on individuals.

135.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can be linked to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

136.    The existence and prevalence of "Fullz" packages means the PII stolen from the Data Breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

137.    Thus, even if certain information (such as contact information) was not stolen in the Data Breach, criminals can still easily create a comprehensive "Fullz" package.

138.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate Risk of Identity Theft & Fraud***

139.    As a result of the recognized risk of identity theft, when a Data Breach occurs and an individual is notified by a company that their PII was compromised, as in this Data Breach, a reasonable person is expected to take steps and spend time addressing the dangerous situation, learning about the breach, and otherwise mitigating the risk of becoming a victim of identity theft or fraud. Failure to take steps to review accounts or credit reports could expose the individual to

---

*Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/

greater financial harm—yet, the resource and asset of time has already been lost.

140.   Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter, instructs Plaintiffs and Class Members to take the following measures to protect themselves: "remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information."[43]

141.   In addition, Defendant's Notice letter includes multiple pages that recommend that Plaintiffs and Class Members partake in activities such as monitoring their accounts, placing security freezes and fraud alerts on their accounts, and contacting consumer reporting bureaus.[44]

142.   Defendant's extensive list of suggested protective measures demonstrates the significant time placed on Plaintiffs and Class Members in responding to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, they suffered actual injury and damages in the form of lost time spent on mitigation efforts in response to the Data Breach and as directed by Defendant's Notice Letter.

143.   Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[45]

144.   Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial

---

[43] Notice Letter.

[44] *Id.*

[45] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

145.    For those Class Members who experience actual identity theft or fraud, the GAO likewise noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[45]

***Diminution of Value of PII***

146.    PII is a valuable property right.[47] That value is obvious when one considers the value of Big Data in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

147.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[48]

148.    There is also an active and robust legitimate marketplace for PII. In 2019, the data brokering industry was worth roughly $200 billion.[49]

149.    In fact, the data marketplace is so sophisticated that consumers can actually sell

---

[46] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[47] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[48] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[49] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

150. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

151. As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and its rarity has been lost, thereby causing additional loss of value.

152. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

153. The fraudulent activity resulting from the Data Breach may not come to light for years.

154. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

155. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, on information and belief, tens of thousands of individuals' detailed personal information and, thus, the significant number of

individuals who would be harmed by the exposure of the unencrypted data.

156.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

### *Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring*

157.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

158.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

159.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

160.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### *Loss of Benefit of the Bargain*

161.    Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class

Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for financial services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product or service and the necessary security measures to protect their PII. When in fact, Defendant failed to provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of lesser value than what was reasonably expected under the bargains they struck with Defendant.

### Plaintiffs Stephanie Tabibian's Experience

162.    Plaintiff Tabibian was required to provide her PII as part of her mortgage application with Defendant.

163.    Plaintiff Tabibian is very careful about sharing her sensitive PII. She stores any documents containing PII in a secure location, uses unique usernames and passwords for her online accounts, and destroys any mail containing Private Information or details that could compromise her identity or credit. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Had she known about Defendant's lax data security practices, she would not have entrusted Defendant with her PII.

164.    On March 25, 2025, Defendant sent Plaintiff Tabibian a Notice Letter informing her that her Private Information had been compromised in the Data Breach. According to the letter, hackers acquired files containing Plaintiff Tabibian's sensitive PII, including her name, date of birth, address, driver's license number, financial account information, Social Security number, and "similar information."

165.    As a result of the Data Breach—and at the direction of Defendant's Notice Letter, which instructs Plaintiff Tabibian to "remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information," Plaintiff

Tabibian has spent time and effort monitoring her accounts and taking steps to protect herself from identity theft.

166.    The fraud and identity monitoring services offered by Defendant place the burden squarely on Plaintiff Tabibian and other Class Members, requiring them to spend time enrolling in the service. Nonetheless, Plaintiff Tabibian made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying its legitimacy, monitoring her accounts and credit score, and changing her passwords.

167.    Plaintiff Tabibian has spent significant time dealing with the consequences of the Data Breach—valuable time she otherwise would have spent on work or recreation. This time has been permanently lost and cannot be recovered. To date, Defendant has done next to nothing to adequately protect Plaintiff Tabibian or Class Members or to compensate them for the time spent monitoring accounts, placing credit freezes and fraud alerts, and changing passwords.

168.    Upon information and belief, Plaintiff Tabibian's PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted her data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, whereas of March 29, 2025, it already been viewed 2,981 times.

169.    Plaintiff Tabibian suffered actual injury as a result of the Data Breach, including but not limited to (a) invasion of privacy; (b) misuse and theft of her PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of the benefit of the bargain; (f) nominal damages; and (g) the continued and certainly increased risk to her PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so

long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

170.    Plaintiff Tabibian also suffered actual injury in the form of increased spam calls, texts, and/or emails, which, on information and belief, were caused by the Data Breach.

171.    The Data Breach has caused Plaintiff Tabibian to suffer fear, anxiety, and stress, which have been compounded by the reality that she must remain vigilant for the rest of her life.

172.    As a result of the Data Breach, Plaintiff Tabibian anticipates spending considerable time and money on an ongoing basis to mitigate and address the resulting harm.

173.    As a result of the Data Breach, Plaintiff Tabibian also faces a current and continuing heightened risk of identity theft and fraud for years to come.

174.    Plaintiff Tabibian has an ongoing interest in ensuring that her PII—which, on information and belief, remains stored and backed up by Defendant—is properly protected from future breaches.

### *Plaintiffs Timohil Kraker's Experience*

175.    Plaintiff Kraker was required to provide his PII as part of his mortgage application with Defendant.

176.    Plaintiff Kraker is very careful about sharing his sensitive PII. He stores any documents containing PII in a secure location, uses unique usernames and passwords for his online accounts, and destroys any mail containing Private Information or details that could compromise his identity or credit. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Had he known about Defendant's lax data security practices, he would not have entrusted Defendant with his PII.

177.    On March 25, 2025, Defendant sent Plaintiff Kraker a Notice Letter informing him that his Private Information had been compromised in the Data Breach. According to the letter,

hackers acquired files containing Plaintiff Kraker's sensitive PII, including his name, date of birth, address, driver's license number, financial account information, Social Security number, and "similar information."

178.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff Kraker to "remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information[,]"[50] Plaintiff Kraker has spent time and effort monitoring his accounts and taking steps to protect himself from identity theft.

179.    The fraud and identity monitoring services offered by Defendant place the burden squarely on Plaintiff Kraker and other Class Members, requiring them to spend time enrolling in the service. Nonetheless, Plaintiff Kraker made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying its legitimacy, monitoring his accounts and credit score, and changing his passwords.

180.    Plaintiff Kraker has spent significant time dealing with the consequences of the Data Breach—valuable time he otherwise would have spent on work or recreation. This time has been permanently lost and cannot be recovered. To date, Defendant has done next to nothing to adequately protect Plaintiff Kraker and Class Members or to compensate them for the time spent monitoring accounts, placing credit freezes and fraud alerts, and changing passwords.

181.    Upon information and belief, Plaintiff Kraker's PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted her data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, whereas of March 29, 2025, it already been viewed 2,981 times.

---

[50] Notice Letter.

182.    Plaintiff Kraker suffered actual injury as a result of the Data Breach including, but not limited to (a) invasion of privacy; (b) misuse and theft of his PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of the benefit of the bargain; (f) nominal damages; and (g) the continued and certainly increased risk to his PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

183.    Plaintiff Kraker also suffered actual injury in the form of increased spam calls, texts, and/or emails, which, on information and belief, were caused by the Data Breach.

184.    The Data Breach has caused Plaintiff Kraker to suffer fear, anxiety, and stress, which have been compounded by the reality that he must remain vigilant for the rest of his life.

185.    As a result of the Data Breach, Plaintiff Kraker anticipates spending considerable time and money on an ongoing basis to mitigate and address the resulting harm.

186.    As a result of the Data Breach, Plaintiff Kraker also faces a current and continuing heightened risk of identity theft and fraud for years to come.

187.    Plaintiffs Kraker has an ongoing interest in ensuring that his PII, which, on information and belief, remains stored and backed up by Defendant—is properly protected from future breaches.

### Plaintiffs Alexander Cnossen's Experience

188.    Plaintiff Cnossen was required to provide his PII as part of his mortgage application with Defendant.

189.    Plaintiff Cnossen is very careful about sharing his sensitive PII. He stores any

documents containing PII in a secure location, uses unique usernames and passwords for his online accounts, and destroys any mail containing Private Information or details that could compromise his identity or credit. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Had he known about Defendant's lax data security practices, he would not have entrusted Defendant with his PII.

190.    On March 25, 2025, Defendant sent Plaintiff Cnossen a Notice Letter informing him that his Private Information had been compromised in the Data Breach. According to the letter, hackers acquired files containing Plaintiff Cnossen's sensitive PII, including his name, date of birth, address, driver's license number, credit report, financial account information, Social Security number, and "similar information."

191.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiffs to "remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information[,]"[51] Plaintiff Cnossen has spent time and effort monitoring his accounts and taking steps to protect himself from identity theft.

192.    The fraud and identity monitoring services offered by Defendant place the burden squarely on Plaintiff Cnossen and other Class Members, requiring them to spend time enrolling in the service. Nonetheless, Plaintiff Cnossen made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying its legitimacy, monitoring his accounts and credit score, and changing his passwords.

193.    Plaintiff Cnossen has spent significant time dealing with the consequences of the Data Breach—valuable time he otherwise would have spent on work or recreation. This time has

---

[51] Notice Letter.

been permanently lost and cannot be recovered. To date, Defendant has done next to nothing to adequately protect Plaintiff Cnossen and Class Members or to compensate them for the time spent monitoring accounts, placing credit freezes and fraud alerts, and changing passwords.

194.   Upon information and belief, Plaintiff Cnossen's PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted her data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, where as of March 29, 2025, it already been viewed 2,981 times.

195.   Plaintiff Cnossen suffered actual injury as a result of the Data Breach including, but not limited to (a) invasion of privacy; (b) misuse and theft of his PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of the benefit of the bargain; (f) nominal damages; and (g) the continued and certainly increased risk to his PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

196.   Plaintiff Cnossen also suffered actual injury in the form of increased spam calls, texts, and/or emails, which, on information and belief, were caused by the Data Breach.

197.   The Data Breach has caused Plaintiff Cnossen to suffer fear, anxiety, and stress, which have been compounded by the reality that he must remain vigilant for the rest of his life.

198.   As a result of the Data Breach, Plaintiff Cnossen anticipates spending considerable time and money on an ongoing basis to mitigate and address the resulting harm.

199.   As a result of the Data Breach, Plaintiff Cnossen also faces a current and continuing heightened risk of identity theft and fraud for years to come.

200.     Plaintiff Cnossen has an ongoing interest in ensuring that his PII, which, on information and belief, remains stored and backed up by Defendant—is properly protected from future breaches.

**Plaintiffs Jerri Hopewell's experience**

201.     Plaintiff Hopewell was required to provide her PII as part of her mortgage application with Defendant.

202.     Plaintiff Hopewell is very careful about sharing her sensitive PII. She stores any documents containing PII in a secure location, uses unique usernames and passwords for her online accounts, and destroys any mail containing Private Information or details that could compromise her identity or credit. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Had she known about Defendant's lax data security practices, she would not have entrusted Defendant with her PII.

203.     On March 25, 2025, Defendant sent Plaintiff Hopewell a Notice Letter informing her that her Private Information had been compromised in the Data Breach. According to the letter, hackers acquired files containing Plaintiff Hopewell's sensitive PII, including her name, date of birth, address, driver's license number, financial account information, Social Security number, and "similar information."

204.     As a result of the Data Breach—and at the direction of Defendant's Notice Letter, which instructs Plaintiff Hopewell to "remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information[,]" Plaintiff Hopewell has spent time and effort monitoring her accounts and taking steps to protect herself from identity theft.

205.     The fraud and identity monitoring services offered by Defendant place the burden

squarely on Plaintiff Hopewell and other Class Members, requiring them to spend time enrolling in the service. Nonetheless, Plaintiff Hopewell made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying its legitimacy, monitoring her accounts and credit score, and changing her passwords.

206.    Plaintiff Hopewell has spent significant time dealing with the consequences of the Data Breach—valuable time she otherwise would have spent on work or recreation. This time has been permanently lost and cannot be recovered. To date, Defendant has done next to nothing to adequately protect Plaintiff Hopewell and Class Members or to compensate them for the time spent monitoring accounts, placing credit freezes and fraud alerts, and changing passwords.

207.    Upon information and belief, Plaintiff Hopewell's PII compromised in the Data Breach has already been misused, as the Lynx hacker group targeted her data, stole it from Defendant's systems, and published it on the Lynx dark web leak site, where as of March 29, 2025, it already been viewed 2,981 times.

208.    Plaintiff Hopewell suffered actual injury as a result of the Data Breach, including but not limited to (a) invasion of privacy; (b) misuse and theft of her PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of the benefit of the bargain; (f) nominal damages; and (g) the continued and certainly increased risk to her PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

209.    Plaintiff Hopewell also suffered actual injury in the form of increased spam calls, texts, and/or emails, which, on information and belief, were caused by the Data Breach.

210. The Data Breach has caused Plaintiff Hopewell to suffer fear, anxiety, and stress, which have been compounded by the reality that she must remain vigilant for the rest of her life.

211. As a result of the Data Breach, Plaintiff Hopewell anticipates spending considerable time and money on an ongoing basis to mitigate and address the resulting harm.

212. As a result of the Data Breach, Plaintiff Hopewell also faces a current and continuing heightened risk of identity theft and fraud for years to come.

213. Plaintiff Hopewell has an ongoing interest in ensuring that her PII—which, on information and belief, remains stored and backed up by Defendant—is properly protected from future breaches.

## <u>CLASS ALLEGATIONS</u>

214. Plaintiffs bring this nationwide class action on behalf of themselves and all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

215. The Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose PII was accessed and/or acquired in the Data Breach reported by Defendant in March 2025, including all individuals who received a Notice Letter (the "Class").

216. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

217. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be

narrowed, expanded, or otherwise modified.

218.   Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, on information and belief, thousands of individuals were impacted. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them Breach notification letters).

219.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b.   Whether Defendant had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c.   Whether Defendant had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e.   Whether and when Defendant actually learned of the Data Breach;

f.   Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiffs and

Class Members that their PII had been compromised;

h.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.    Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.    Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct;

k.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm resulting from the Data Breach.

220.   <u>Typicality:</u> Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

221.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. The policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

222.   <u>Adequacy:</u> Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or

adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

223.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

224.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be

unnecessary and duplicative of this litigation.

225. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

226. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

227. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

228. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

229. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant failed to timely notify the Plaintiffs and the class of the Data Breach;

    b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

f.  Whether adherence to FTC and industry experts' data security recommendations would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Class)

230.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 229, as if fully set forth herein.

231.    Defendant requires its customers, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its financial services.

232.    Defendant gathered and stored PII of Plaintiffs and Class Members as part of its business of soliciting and providing financial services.

233.    Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

234.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

235.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the

information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

236. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

237. Defendant's duty to use reasonable security measures also arose under the GLBA, under which it was required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

238. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

239. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant.

240. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

241. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

242.     Defendant also had a duty to exercise appropriate data retention practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

243.     Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

244.     Defendant had, and continues to have, a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

245.     Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.   Failing to adequately monitor the security of their networks and systems;

    c.   Allowing unauthorized access to Class Members' PII;

    d.   Failing to detect in a timely manner that Class Members' PII had been compromised;

    e.   Failing to remove former customers' PII it was no longer required to retain pursuant to regulations, and

    f.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the

potential for identity theft and other damages.

246.     Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

247.     Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

248.     Defendant's violation of Section 5 of the FTC Act constitutes negligence.

249.     The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

250.     A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

251.     It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial services industry.

252.     Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

253.     Plaintiffs and the Class were the foreseeable and probable victims of any inadequate

security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

254.     It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

255.     Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

256.     Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

257.     Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

258.     Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

259.     But for Defendant's wrongful and negligent breach of duties, the PII of Plaintiffs and the Class would not have been compromised.

260.     There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed

as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

261. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to (a) invasion of privacy; (b) misuse and theft of their PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (e) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) experiencing an increase in spam calls, texts, and/or emails; and (g) the continued and certainly increased risk to their PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

262. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risk of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

263. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

264. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*

**(On Behalf of Plaintiffs and the Class)**

265. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 264, as if fully set forth herein.

266. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

267. Defendant's duty to use reasonable security measures also arose under the GLBA, under which it was required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

268. Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

269. Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence *per se.*

270. Class Members are consumers within the class of persons that Section 5 of the FTC Act and GLBA were intended to protect.

271. Moreover, the harm that has occurred is the type of harm that the FTC Act and GLBA intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures

and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

272.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

273.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

274.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to (a) invasion of privacy; (b) misuse and theft of their PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (e) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) experiencing an increase in spam calls, texts, and/or emails; and (g) the continued and certainly increased risk to their PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

275.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-

economic losses.

276. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in the Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

277. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

278. Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

279. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

## <u>COUNT III</u>
### Breach Of Implied Contract
### (On Behalf of Plaintiffs and the Class)

280. Plaintiffs re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 279, as if fully set forth herein.

281. Plaintiffs and Class Members were required to deliver their PII to Defendant as part of the process of obtaining financial services provided by Defendant. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services and would not have paid for Defendant's financial services, or would have paid less for them, had they known that Defendant's data security practices were substandard.

282.     Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

283.     Defendant accepted possession of Plaintiffs' and Class Members' PII for the purpose of providing services to Plaintiffs and Class Members.

284.     Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

285.     In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

286.     Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under secure conditions.

287.     The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

288.     On information and belief, at all relevant times Defendant promulgated, adopted,

and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

289. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

290. Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

291. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

292. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

293. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

294. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

295. Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

296.     Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continuing to accept and retain PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

297.     As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, including but not limited to (a) invasion of privacy; (b) misuse and theft of their PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (e) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) experiencing an increase in spam calls, texts, and/or emails; and (g) the continued and certainly increased risk to their PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

298.     Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

299.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate credit monitoring to all Class Members.

## COUNT IV
### Unjust Enrichment

**(On Behalf of Plaintiffs and the Class)**

300.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 299, as if fully set forth herein.

301.     Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

302.     Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for financial services and in so doing also provided Defendant with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

303.     Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

304.     Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

305.     Defendant acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

306.     If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or obtained services from Defendant.

307.     Plaintiffs and Class Members have no adequate remedy at law.

308. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

309. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

310. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to (a) invasion of privacy; (b) misuse and theft of their PII; (c) lost or diminished value of PII; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (e) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) experiencing an increase in spam calls, texts, and/or emails; and (g) the continued and certainly increased risk to their PII, which, on information and belief (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

311. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

312.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

<b><u>COUNT V</u></b><br/>
<b>INVASION OF PRIVACY – INTRUSION UPON SECLUSION</b><br/>
<b>(On Behalf of Plaintiffs and the Class)</b>

313.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 312, as if fully set forth herein.

314.    Plaintiffs and Class Members have a legally protected privacy interest in their PII, which was, and continues to be collected, stored, and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, as occurred with the Data Breach.

315.    Plaintiffs and Class Members reasonably expected that Defendant would protect and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

316.    Defendant intentionally intruded into Plaintiffs' and Class Members' seclusion by disclosing without permission their PII to a third party. Defendant's acts and omissions giving rise to the Data Breach were intentional in that the decisions to implement lax security and failure to timely notify Plaintiffs and the Class were willful and intentional.

317.    By failing to keep Plaintiff's and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiffs' and Class

Members' privacy right to seclusion by, *inter alia*:

    a. intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    b. invading their privacy by improperly using their PII obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

    c. failing to adequately secure their PII from disclosure to unauthorized persons; and

    d. enabling the disclosure of their PII without consent.

318. This invasion of privacy resulted from Defendant's intentional failure to properly secure and maintain Plaintiffs' and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded and private data.

319. Plaintiffs' and Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiffs' and Class Members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

320. The disclosure of Plaintiffs' and Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

321. Defendant's willful and reckless conduct that permitted unauthorized access, exfiltration and disclosure of Plaintiffs' and Class Members' sensitive PII is such that it would cause serious mental distress, embarrassment or humiliation to people of ordinary sensibilities.

322. The unauthorized access, exfiltration, and disclosure of Plaintiffs' and Class Members' PII was without their consent, and in violation of various statutes, regulations and other

laws.

323.     As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members alternatively seek an award of nominal damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grants the following:

A.     For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.     For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

   i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.     requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.     requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information

when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to reimburse out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals

must take to protect themselves;

    xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

    xviii.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: Wednesday, May 28, 2025        Respectfully Submitted,

By: *s/ Kaleigh N. Boyd*
Kim D. Stephens, P.S., OSB #030635
Kaleigh N. Boyd (*admitted pro hac vice*)
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Telephone: (206) 682-5600
Email: kstephens@tousley.com
Email: kboyd@tousley.com

John J. Nelson (*admitted pro hac vice*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

Andrew J. Shamis*
Leanna Loginov (*admitted pro hac vice*)
**SHAMIS & GENTILE P.A.**
14 NE 1st Ave., Suite 705
Miami, Fl 33132
Telephone: (305) 479-2299
Email: ashamis@shamisgentile.com
Email: lloginov@shamisgentile.com

Melissa G. Meyer*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Email: mmeyer@zlk.com

Kenneth J. Grunfeld*
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Telephone: (954) 525-4100
Email: grunfeld@kolawyers.com

*Attorney for Plaintiffs and*
*The Proposed Class*

*\*Pro Hac Vice application forthcoming*